UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| INSURATIVE PREMIUM FINANCE ) | |
| (JERSEY) LIMITED, ) | |
| ) | |
| Plaintiff/Defendant in ) | |
| Counterclaim, ) | |
| ) | |
| v. ) | Civil Action No. 12-10642-NMG |
| ) | |
| DEUTSCHE BANK SECURITIES, ) | |
| INC. ) | |
| Defendant. ) | |
| and ) | |
| ) | |
| KARL E. HAHN, ) | |
| ) | |
| Defendant/Plaintiff in ) | |
| Counterclaim ) | |
| _____ ) | |

REPORT AND RECOMMENDATION ON DEFENDANT DEUTSCHE BANK
SECURITIES INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT

December 18, 2012

SOROKIN, C.M.J.

The Plaintiff, Insurative Premium Finance (Jersey) Limited ("Insurative"), is a life

insurance premium finance and lending company. Docket # 1 at ¶ 10. It brings suit against the

Defendants Deutsche Bank Securities, Inc. ("DBS") and Karl E. Hahn ("Hahn"), alleging inter

alia that Hahn (an employee of DBS) issued two fraudulent documents signed by him on behalf

of DBS and intended to induce Insurative to lend to clients of Hahn the funds necessary for them

to finance substantial insurance premiums for policies insuring their lives. Id. at ¶¶ 1-2. When

1

Hahn's fraud was discovered, Insurative declared the loans to be in default and Hahn's clients ultimately ended their financing arrangement with Insurative.  Id. at ¶ 3.  Insurative alleges that as a result, it was both unnecessarily exposed to risk of loss and lost its business relationship with Hahn's clients (which eventually would have produced total income in excess of $38 million).  Id.

Pending is DBS's Motion to Dismiss Insurative's Amended Complaint.  Docket # 31. For the following reasons, I RECOMMEND that the Court ALLOW the motion IN PART and DENY it IN PART.

I.     FACTUAL AND PROCEDURAL BACKGROUND

Insurative is a life insurance premium finance and lending company that makes loans to trusts established by wealthy individuals and corporations so that they may finance substantial life insurance policies.  Id. at ¶¶ 10-11.[1]  Its loans are fully collateralized through a combination of the life insurance policy's cash surrender value and other forms of collateral (including cash, marketable securities, or letters of credit).  Id. at ¶ 12. Insurative works with financial services professionals known as "originators" who market the life insurance policies for which Insurative provides or arranges financing.  Id. at ¶ 14.  Insurative's loans are reviewed annually and the collateral value is monitored throughout the year.  Id. at ¶ 17.

Deutsche Bank AG is an international bank headquartered in Germany.  Id. at ¶ 18. DBS is the investment banking and securities arm of Deutsche Bank AG in the United States. Id.  DBAB is the Private Client Services and Private Wealth Management Division of DBS.  Id.

---

[1]  In keeping with the standard of review applicable to motions to dismiss brought pursuant to Fed. R. Civ. P. 12, the Court recites the allegations of the Amended Complaint as if true.  Further facts are recited below, as necessary to the analysis.

At all relevant times, Hahn was a representative and investment advisor registered with the Financial Industry Regulatory Authority.  Id. at ¶ 19.  On or about February 21, 2008, Hahn and DBS entered into an Employment Agreement, by which DBS hired Hahn as a Client Advisor, with the title of Managing Director, in the Boston office of DBAB.  Id.  Hahn had previously been employed by Merrill Lynch.  Id. at ¶ 21.

Michael and Susan Myers have been married since 2002, and reside in Nevada.  Id. at ¶ 25.  After meeting with Hahn in June, 2006, the Myers transferred their investment assets and portfolios to Merrill Lynch to be under Hahn's management and control.  Id. at ¶¶ 26-27.  When Hahn moved to DBS, the Myers moved their portfolio from Merrill Lynch to DBS so that it could remain under Hahn's management.  Id. at ¶ 27.

In April 2008, Hahn and an insurance agent, James Archibald, traveled to the Myers' home to meet with the Myers.  Id. at ¶ 28.  Archibald advised the Myers to purchase large life insurance policies by borrowing from a lender the sums needed to pay the premiums.  Id. at ¶ 29.  Archibald advised the Myers that by doing so, they would avoid out-of–pocket costs because the accumulated cash value of the insurance policies would exceed the interest and other charges on the loans, with the result that the Myers would never be personally responsible for any of the debt incurred (other than through the cash value of the policies).  Id.  Archibald and Hahn also advised the Myers that the loan would be a "non-recourse" loan, meaning that their "assets and investments would never need to be used to pay any debt or interest charges from the borrowing to pay premiums."  Id.

Hahn told the Myers that he would obtain a Letter of Credit from DBAB guaranteeing the premium loan and that he could obtain such a Letter of Credit at no cost, although the cost of

such a service would ordinarily be valued at $26,000 or more.  <u>Id.</u> at ¶ 30.  Hahn and Archibald

did not inform the Myers at this meeting about requirements for obtaining a Letter of Credit or

premium financing, purchasing life insurance coverage, or any commissions that would be

generated by a such transactions.  <u>Id.</u>  The Meyers subsequently learned that the commission

paid to Hahn, Archibald and Archibald's firm exceeded $1 million.  <u>Id.</u> at ¶ 63.

  <u>Policy Insuring Susan Myers' Life</u>

  On July 3, 2008, Susan Myers submitted an Insurative Premium Financing

Application.  <u>Id.</u> at ¶ 34; Docket # 27-7.  She stated in her application that she would establish an

irrevocable insurance trust to finance the purchase of a life insurance policy from American

General Life Insurance Company (AIG).  Docket # 27 at ¶ 34.

  On July 10, 2008, Insurative provided a  Summary of Terms which specified that a loan

to finance the premium on the AIG policy was to be repaid upon the earliest of: (I) the date when

the Policy Trustee receives the proceeds of the Policy upon the death of the Insured, (ii) the date

the Policy Trustee Loan is accelerated pursuant to an Event of Default, or (iii) the 20th

anniversary of the Drawdown Date (<u>i.e.</u>, the twentieth anniversary of the policy issue date).

Docket # 27 at ¶ 35; Docket # 27-8.  "<u>[A]ssuming that the insured remained alive and the loan</u>

<u>was not in default, it was anticipated</u> that the loan would continue for a period of twenty years."

Docket # 27 at ¶ 35 (emphasis added).  Nevertheless, under the loan's terms, the Myers would be

within their contractual rights to terminate the loan by paying off the then-outstanding principal

and interest at any time (along with any accrued and applicable penalties and fees).  <u>See</u> Docket

# 27-8 at 5.

  On or about July 16, 2008, Insurative entered into a Policy Trustee Facility Agreement

with the Susan Myers Massachusetts Trust.  Docket # 28-10.  That agreement recited that it would be used by the Policy Trustees "to fund payment of the upfront Premium or purchase of the Policy and payment of other Premiums from time to time in accordance with the terms of such Policy." Id. at § 3.1(b).  Section 5.1 governed Policy Trustee Loan Advances.  It provided that Insurative would advance amounts requested by the Policy Trustee provided certain specified conditions were met, including that the request was made "in an available Drawdown Date" and that Insurative "will have funds available to advance."  Id. at § 5.1 (a)-(b).  Nothing in the Facility Agreement obligated Insurative to make any particular number of loan advances to the Trustee, nor was the Trustee obligated to make a specified number of requests for loan advances.  Rather, the Facility Agreement establishes a credit line upon which the Policy Trustee could draw, subject to certain conditions.  Moreover, the Policy Trustee was never obligated to request further loan advances.

Various provisions of the life insurance policy itself could result in the termination of the life insurance policy prior to the anticipated twenty years.  See Docket # 27-5 at 23.  For example, the policy terminated if the insured died.  Id.  Similarly, the insured was entitled to surrender the policy for its cash value prior to the expiration of the twenty year term at her election.  Id. at 16.  Insufficient cash value to cover premium would result in the policy lapsing and terminating, if not reinstated.  Id. at 23.  In these circumstances, the Policy Trustee would not be obligated under the Facility Agreement to request further loan advances.

The total loan amount required for the first year of the AIG Policy was $1,384,252 ($1,373,865 to AIG as insurance premium and $10,387 for various transaction costs).  Docket # 27 at ¶ 36.  Insurative required collateral of $1,467,307, representing for the full amount of the

loan ($1,384,252) plus interest for five quarters at 4.8% ($ 83,055).  Id.  The guaranteed cash surrender value of the AIG Policy during the initial year was $783,077, leaving a balance of $686,000 of collateral required by Insurative on the AIG Policy.  Id.

On July 15, 2008, as additional collateral for the Insurative loan, Hahn provided Insurative with a "Clean, Unconditional and Irrevocable Letter of Credit," in the amount of $686,000 to the Collateral Trustee for Insurative.  Id. at ¶ 37.  The Letter of Credit was on DBAB letterhead and was signed by Hahn as Managing Director of Deutsche Bank.  Id.; Docket # 27-9.  Insurative alleges that it would not have agreed to provide the premium financing for the AIG Policy had that financing not been 100% collateralized by means of the Letter of Credit. Docket # 27 at ¶ 39.

On July 20, 2008, an Indexed Flexible Premium Adjustable Universal Life Insurance Policy was issued by AIG on the life of Susan Myers for $22.9 million.  Docket # 27 at ¶ 31; Docket # 27-5.  The owner of that policy was the Susan Myers Massachusetts Trust and the annual premium for each of the first eight years of that policy was $1,373,865.37.  Docket # 27 at ¶ 31.  Archibald had arranged for an attorney to form the owner Trust, and arranged for Insurative to fund the premiums as described above.  Id. at ¶ 32.

Policy on Michael Myers' Life

Similarly, on November 19, 2008, the Allianz Life Insurance Company of North America issued a Policy naming Michael Myers as the insured and The Michael F. Myers Massachusetts Trust as owner and having a death benefit of $15 million and an annual premium of $886,325 for each of the first twelve years.  Id. at ¶ 33; Docket # 27-6.  Archibald also arranged for the Allianz Life Policy to be funded by Insurative.  Docket # 27 at ¶ 33.  On or about December 9,

2008, Insurative entered into a Policy Trustee Facility Agreement with the Michael Myers to finance the premiums for the Allianz Policy. Id. at ¶ 42; See Docket # 27-12. The Facility Agreement between Insurative and the Michael Myers Trust contained the identical terms described, supra, with respect to the Facility Agreement between Insurative and the Susan Myers Trust. Docket # 27-12. Various provisions of the Allianz insurance policy itself could result in the termination of the life insurance policy prior to the anticipated twenty years. For example, non payment of premium would result in the policy lapsing and terminating if not reinstated. See Docket # 27-6 at 31. Similarly, the insured was entitled to surrender the policies for their cash value prior to the expiration of the twenty year term at their election. Id. at 33.

With respect to the Allianz Policy, Insurative calculated the total loan amount required would be $894,272 ($886,325 for insurance premium, $7,949 for various transaction costs). Id. at ¶ 40. Insurative required collateral of $947,372, representing the full amount of the loan ($894,272) plus loan interest for five quarters. Id. Available collateral included a DBS account containing government bonds valued at $968,910, which combined with the guaranteed cash surrender value of the policy ($138,986), resulted in total collateral available of $1,107,896, which was sufficient (without a Letter of Credit such as has been needed in the case of the AIG Policy). Id. A "Control Agreement" was executed by the Myers and Hahn, in his capacity as Managing Director of DBAB, whereby the Myers pledged assets in a DBAB account as collateral for the loan and DBAB was prohibited from complying with any orders or instructions from the Myers regarding the pledged assets. Id. at ¶ 41; See Docket # 27-11. Insurative alleges that it would not have agreed to provide the premium financing for the Allianz Life Policy without the Control Agreement being in place. Docket # 27 at ¶ 41.

Events Subsequent to Issuance of the Policies

On or about May 8, 2009, Hahn was terminated for cause by DBS.  Id. at ¶ 44.  Hahn told Susan Myers sometime during the summer of 2009 that he had left his position at DBAB to become a Managing Director of Investments at Oppenheimer & Co., Inc..  Id. at ¶¶ 45-46.  Hahn advised the Myers to transfer their assets from DBS to Oppenheimer so that he could continue to manage their investments and provide financial advice to them.  Id. at ¶ 46.  Hahn told the Myers that he would arrange the transfers and that there was no need to leave any amounts at DBS.  Id.  Sometime before July 1, 2009, and without Insurative's knowledge, Hahn transferred all of the Myers' assets from DBS to Oppenheimer.  Id. at ¶ 47.

On or about July 1, 2009, Insurative made a collateral check at DBS for the current values of the Myer's security accounts and received no reply from DBS.  Id. at ¶ 47.  It then discovered that the Myers' assets had been transferred from DBS to Oppenheimer.  Id.  On July 17, 2009, Insurative made inquiries of DBS to ascertain whether DBS would honor the terms of the Letter of Credit and the Control Agreement.  Id. at ¶ 48.  By letter dated July 24, 2009, DBAB advised Insurative that it had no record of those documents.  Id.; See Docket # 27-13.  The Letter of Credit and the Control agreement were fraudulent documents created by Hahn.  Id. at ¶¶ 53. 67, 70.

Insurative viewed discovery of the fact that both the Letter of Credit and the Control Agreement were fraudulent as events of default under clause 14.1 of each policy's Facility Agreement.  Id. at ¶¶ 55, 57.  Despite its right under the Facility Agreements, section 14.2, to demand immediate payment of all amounts accrued or outstanding under both of the loan agreements, Insurative "gave the Myers an opportunity to cure the defaults by immediately

transferring and pledging the missing loan security to a Lender approved bank as required under both of the respective loan agreements." Id. at ¶ 59.  Insurative advised the Myers that because Oppenheimer was not included on the Insurative list of approved banks and financial institutions with which it could enter into a collateral arrangement or accept a letter of credit, it could not enter into a collateral arrangement with Oppenheimer.  Id. at ¶ 60.  Insurative offered to allow the Myers to cure the defaults by moving their assets to a bank that had already been approved by Insurative, a proposal to which the Myers initially agreed.  Id. at ¶ 61.  The funds remained under the management of Hahn, however, and Hahn did not agree to transfer the funds or offer any institution other than Oppenheimer with which Insurative could enter into collateral arrangements or letters of credit.  Id.

By letters dated July 22, 2009, Insurative advised the Myers and the trustees that the two loans were in default and requested payment by July 28, 2009 of $1,465,809 (as payment of outstanding principal, interest, and expenses for the loan for the AIG policy premium) and payment of $944,867 as payment of outstanding principal, interest, and expenses for the loan for the Allianz Policy premium.  Id. at ¶ 62; Docket # 27-16.  The Myers obtained a loan through Merrill Lynch which provided them with funds to pay off and retire the two Insurative loans.  Id. at ¶ 64.

Insurative alleges that although the Myers did pay off the loans advanced by Insurative, it was nevertheless needlessly exposed to loss as a result of the fraudulent Control Agreement and Letter of Credit because the financing was not collateralized.  Id. at ¶ 71.  Additionally, it alleges that "when they entered into the premium financing agreements, Insurative and the Myers had contemplated a lengthy twenty-year financing relationship during which time, Insurative stood to

earn $22,096,633 in interest and fees on the Susan Myers loan and $16,253,292 in interest and fees on the Michael Myers loan."  Id.  The Defendants' wrongful conduct, it alleges, "interfered with those relationships and, as a result, Insurative has been deprived of the expected and bargained for benefits from those relationships."  Id.

On April 10, 2012, Insurative filed suit against Hahn and DBS.  Docket # 1.  In its Amended Complaint, Insurative advances the following claims:

1.  Count I is for Fraudulent Misrepresentation, against Hahn;

2.  Count II is for Fraudulent Misrepresentation, Based on Apparent Authority, against DBS;

3.  Count III is for Fraudulent Misrepresentation, Based on Respondeat Superior, against DBS;

4.  Count IV is for Tortious Interference With Advantageous Business Relations, against both Defendants;

5.  Count V is for Tortious Interference With Advantageous Business Relations, Based on Respondeat Superior, against DBS;

6.  Count VI is for Unfair and Deceptive Acts or Practices In Violation of M.G.L. c. 93A, § 11, against both Defendants;

7.  Count VII is for Promissory Estoppel, against both Defendants;

8.  Count VIII is for Breach of Contract, against both Defendants;

9.  Count IX is for Breach of the Implied Covenant of Good Faith and Fair Dealing, , against both Defendants; and,

10. Count X is for Negligent Supervision and Retention, against DBS.

Docket # 27.

On August 24, 2012, DBS moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint as failing to state a claim upon which relief may be granted.  Docket # 31. A hearing was held on November 16, 2012.

II.     STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662 (2009)  129 S.Ct. 1937, 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993).  This "highly deferential" standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir.1992). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir.1997)(quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir.1988) (internal quotation marks omitted). The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Iqbal, 129 S.Ct. at 1949. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Id.  The Court's assessment of the pleadings is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense."

Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir.2009)(quoting Iqbal, 129 S.Ct. at 1949).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief." Id.

In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.  Nollet v. Justices of the Trial Court of Mass., 83 F.Supp.2d 204, 208 (D.Mass.2000), aff'd, 248 F.3d 1127 (1st Cir.2000).

III.   DISCUSSION

In its motion to dismiss, DBS argues that: (1) the claims against it for fraudulent misrepresentation each fail to allege any cognizable legal injury; (2) the claims against it for tortious interference with business relations fail because the Amended Complaint fails to allege actual harm, fails to allege that DBS intentionally interfered with Insurative's relationships with a third party, and that any conduct by DBS which was simply protecting its own economic interests cannot be tortious; (3) that the c. 93A claim is deficient because it is predicated upon legally-deficient common-law claims; (4) that the common-law contract claims fail because the Amended Complaint alleges no facts suggesting that DBS's purported wrongdoing caused Insurative's alleged damages, or that Insurative sustained any damages caused by those actions; and, (5) that the Amended Complaint fails to state a cognizable claim for direct liability against Hahn and therefore it cannot state a derivative claim for negligent supervision of Hahn against DBS.  Docket # 31.

Fraudulent Misrepresentation

Counts II and IIII of the Amended Complaint are directed against DBS for Fraudulent Misrepresentation.  Docket # 27 at ¶¶ 78-86.  Count II is based upon Hahn's apparent authority (i.e., that DBS's conduct caused Insurative to reasonably believe that Hahn had authority to execute the Letter of Credit and Control Agreement, and that Insurative entered into agreements with the Myers to finance their life insurance policies in reliance upon this reasonable belief).[2] Id. at ¶ 79.  Count IIII is based upon a theory of respondeat superior (i.e., that DBS is vicariously liable for Hahn's fraudulent misrepresentations because Hahn was employed by DBS and his fraudulent conduct was committed within the scope of his employment).  Id. at ¶ 85.

To recover for fraudulent misrepresentation, Insurative "must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage."  Kilroy v. Barron, 326 Mass. 464, 465 (1950).[3]  DBS asserts in its motion that Insurative has failed to properly plead the final element in that it has not pleaded cognizable damages.  See Docket # 32 at 15-18.

With respect to its damages in Counts II and III, Insurative alleges that "[a]s a direct and

---

[2]  DBS's counsel informed the Court at the November 15, 2012, hearing on this matter that for the purposes of resolution of this motion only, DBS concedes Hahn's apparent authority.

[3]  The premium financing loan documents recite that they are governed by and construed in accordance with Massachusetts law.  See Docket # 27-8 at 8; The Control Agreement and Letter of Credit recite that they are to be governed by and construed in accordance with the law of the state of New York.  Docket # #27-11 at ¶ 10; Docket # 27-9 at 3.  Neither party has urged the application of any law other than that recited in the contracts, and the Court will therefore follow that course with respect to the contracts, and will otherwise apply Massachusetts law (the parties again having urged no other course of action).

proximate result of Defendant Hahn's fraudulent conduct . . .  Insurative suffered damages in excess of $38 million, exclusive of interest, costs and attorneys' fees."  Docket # 27 at ¶¶ 83, 86. Elsewhere in the Amended Complaint, Insurative explains this figure.  "Insurative suffered significant harm since, not only was it unnecessarily exposed to the risk of loss, but also because it lost an extremely valuable business relationship with the Myers that eventually would have produced total income in excess of $38 million."  Id. at ¶ 3.  Similarly, it describes the $38 million figure as comprising "the bargained for benefit of its expected long-term financial relationship with the Myers."  Id. at ¶ 77.

"'Benefit of the bargain' damages refers to the difference in the value between what a plaintiff has received 'and the actual value of what he would have received if the representations had been true.'"  Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 424 n.24 (2005) (quoting Rice v. Price, 340 Mass. 502, 507 (1960)).  "[T]he usual rule, at least in appropriate cases" is that in cases of fraudulent or intentional misrepresentation, an injured party receives benefit of the bargain damages.  Twin Fires, 340 Mass. at 425.  The rule, however, is not absolute and "may be modified or supplemented to prevent injustice," Id. (citing Rice, 340 Mass. at 507).  Such damages are generally available only where proved with reasonable certainty and where out-of-pocket damages would not afford just compensation because one party is "left with something acquired under the transaction which, because of the matter misrepresented, he does not want and cannot use."  Twin Fires, 340 Mass. at 424 n. 24 (quoting Restatement (Second) of Torts § 549(2) comment (g)).   In Twin Fires, the Supreme Judicial Court noted that, "[o]ur courts have consistently limited the award of benefit of the bargain damages to cases of intentional misrepresentation where the person who was the target of the

misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it." <u>Twin Fires</u>, 340 Mass. at 425.

Following the revelation of Hahn's misconduct, Insurative was indeed left with something (a partially-collateralized loan) that was of less value than what it had been led to believe it had bargained for (<u>i.e.</u>, a fully-collateralized loan). Insurative has sufficiently pleaded a right to recover benefit of the bargain damages.

It does not follow, however, that because Insurative is entitled to benefit of the bargain damages that it is entitled to recover such damages as it has formulated them in the Amended Complaint – <u>i.e.</u>, "the bargained for benefit of its expected long-term financial relationship with the Myers." Docket # 27 at ¶ 77. Rather, the "bargain" here at issue is Insurative's bargain with the Defendant, DBS.

Instructive in this regard are the Massachusetts form jury instructions for fraudulent misrepresentation, which state that "[i]n a case where there has been an intentional or reckless misrepresentation, the law provides that the plaintiff may recover <u>the benefit of what [he/she] was promised by the defendant</u>." Massachusetts Superior Court Civil Practice Jury Instructions Volume II, ch. 20.1.8. (emphasis added). "In other words . . . you should award the plaintiff a sufficient amount of money to put [him/her] in the position that [he/she] would have been in if the situation had been as represented by the defendant. In other words . . . the plaintiff is entitled to recover damages sufficient to give [him/her] the <u>benefit of the bargain with the defendant</u> if those damages are proved with reasonable certainty." <u>Id.</u> (emphasis added).

What Insurative bargained for from DBS was collateral (in the form of the Letter of Credit and the Control Agreement). Had the Myers not made payment to Insurative upon

demand, Insurative would potentially have been entitled to recover from DBS the benefit of its

bargain with DBS – that is, amounts (the value of the Letter of Credit and the value of the

investment account which should have encumbered by the Control Agreement) sufficient to fully

collateralize the loans.  However, Insurative has pleaded in the Amended Complaint that the

Myers have paid all amounts due under the Loan Agreement.  Docket # 27 at ¶ 64 ( the Myers

"were ultimately forced to obtain a loan through Merrill Lynch which provided funds to pay off

and retire the two Insurative loans").  Thus, Insurative has succeeded in mitigating its

recoverable benefit of the bargain damages.  Insurative does not claim any reliance damages

(designed to place an injured party in as good a position as it would have been in had it never

entered into the contract and similar to the tort standard of actual, out-of-pocket loss).  See

VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 612 n.2 (1994).[4]

Because Insurative does not have cognizable damages on its fraudulent misrepresentation

claims, I therefore RECOMMEND that Counts II and III be DISMISSED.

**Tortious Interference With Advantageous Business Relations**

Count IV of the Amended Complaint is against Hahn and DBS (directly) for Tortious

Interference With Advantageous Business Relations, while Count V makes the same claim

---

[4]  The Court notes that the benefit of the bargain damages as formulated by Insurative are also highly speculative, even had these damages been recoverable.  Nothing in the agreements between Insurative and the Trustees obligated the Trustees (or the Myers) to continue the relationship with Insurative for twenty years.  These agreements essentially created a line of credit which permitted the Trustees (under certain conditions) to request annual loans to pay premium.  The Trustees were free to fund the insurance policies by other means.  The Myers were free to terminate the policies.  Numerous conditions would have permitted Insurative to decline future loan advance requests.  Moreover, the DBS Letter of Credit and the Control Agreement were insufficient to collateralize future premium loan advances.  These contracts did not obligate DBS to provide additional collateral.  Even consideration of the larger bargain of the entire deal would not entitle Insurative to damages greater than its legal rights under the contract – i.e., one year of loans fully collateralized.

against DBS, but is purportedly based upon the doctrine of respondeat superior.  Docket # 27, ¶¶ 87-95.

"In order to make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998).  If the plaintiff does not suffer any pecuniary loss as a result of the defendant's actions, there can be no recovery. See Birbiglia v. Saint Vincent's Hosp., Inc., 427 Mass. 80, 83 (1998); See also Restatement (Second) of Torts, §766A ("One who intentionally and improperly interferes with the performance of a contract . . .  between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him").  "The cause of action is for pecuniary loss resulting from the interference.  Recovery may be had also for consequential harms for which the interference was a legal cause." Restatement (Second) of Torts, §774A.

Respondeat superior is the proposition that an employer should be held vicariously liable for the torts of its employee, committed within the scope of employment.  Kavanagh v. Trustees of Boston University, 440 Mass. 195, 198 (2003).  Insurative's formulation that Count IV is against DBS directly while Count V is based upon respondeat superior presents a false dichotomy in that both counts are, by necessity, based upon respondeat superior, with the distinction between the counts arising not from the theory of liability, but rather from the identity of the employee whose tortious conduct is attributed to DBS – (Hahn in Count V, and other DBS

17

employees in Count IV) and the specific conduct at issue (Hahn's fraud in Count V, and other conduct described <u>infra</u> in Count IV).

<u>Count IV</u>

With respect to Count IV, Insurative alleges that DBS interfered with Insurative's relationship with the Myers by improper means when it failed to honor the Letter of Credit and Control Agreement – that is, Insurative alleges that the breach of those contracts was itself "improper means" supporting the tortious interference claim it brings directly against DBS.  <u>See</u> Docket # 36 at 24; Docket # 27 at ¶ 94.  Insurative argues that it is not necessary for it to allege improper motive on the part of DBS where it has alleged improper means.  Docket # 36 at 23-24 (citing <u>Buster v. Moore, Inc.</u>, 438 Mass. 635, 652 (2003); <u>Netherwood v. American Federation of States, County and Municipal Employees, Local 1725</u>, 53 Mass. App. Ct. 11, 21 (2001)).

Insurative concedes that it cannot show an improper <u>motive</u> on the part of the DBS employees who made the decision not to honor the Control Agreement and Letter of Credit.  It is sufficient to state a claim, however, if Insurative can allege that DBS interfered with Insurative's relationship with the Myers via improper <u>means</u>, and to do so it focuses upon DBS's failure to honor the Letter of Credit and Control Agreement – that is, Insurative alleges that the breach of those contracts was the "improper means" supporting the tortious interference claim it brings directly against DBS.  <u>See</u> Docket # 36 at 24; Docket # 27 at ¶ 94.

For purposes of the tortious interference cause of action, "improper means" may consist of a violation of a statute or common law precept.  <u>Kurker</u>, 44 Mass.App.Ct. at 192 (finding a breach of fiduciary duty to constitute improper means).  The Restatement (Second) of Torts lists seven factors bearing upon the determination of whether or not an actor's conduct in interfering with a contractual relation is improper. Restatement (Second) of Torts, § 767 (1965).  They are

(a) the nature of the DBS's conduct, (b) DBS' motive, (c) the interests of Insurative with which DBS's conduct interferes, (d) the interests sought to be advanced by DBS, (e) the social interests in protecting the freedom of action of DBS and the contractual interests of Insurative, (f) the proximity or remoteness of DBS's conduct to the interference and (g) the relations between the parties." Id.  The Restatement notes that in assessing whether the actor's conduct is improper or not, the factors listed in §767 may be helpful, but "a balancing process must be followed for the individual case." Id. at comment (j).  "It has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances.  Recognized standards of business ethics and business customs and practices are pertinent" to this inquiry.  Id.

DBS's failure to honor a contract which Insurative has pleaded was fraudulent is not improper means, under all of the circumstances described in the Amended Complaint.  While DBS may have committed a breach of the contracts, and while DBS may be bound under Hahn's apparent authority to honor the agreements, Insurative already has a remedy in contract for that breach.  This breach situation is unlike that presented in Kurker, which involved the breach of a fiduciary duty, an ethical violation.   See Kurker, 44 Mass.App.Ct. at 192 (finding a breach of fiduciary duty to constitute improper means).  The decision to breach the agreements (if Hahn's apparent authority, which is presumed here, was established) is not an unreasonable business decision, nor is it unethical under the circumstances.  See, e.g., K & K Management, Inc. v. Lee 316 Md. 137, 169-70 (1989) ("If breach of the . . . contract were treated as an improper means which overrides the lack of motive to interfere in the incidental relations between [parties], then the interference tort becomes boundless and only rarely would the breach of a commercial contract fail to be a tort as well").

I therefore RECOMMEND that the Court DISMISS Count IV.

19

Count V

In Count V, Insurative alleges that Hahn interfered with Insurative's advantageous business relations with the Myers via improper means "by executing fraudulent documents and transferring their investment assets from DBS to Oppenheimer" and that DBS is liable for same on the basis of the doctrine of respondeat superior.  Docket # 27 at ¶¶ 94-95.

Insurative alleges in the Amended Complaint that DBS terminated Hahn for cause by DBS on May 8, 2009.  Docket # 27 at ¶ 19.  It further alleges that subsequent to his termination by DBS, Hahn secured employment at Oppenheimer and transferred all of the Myers's assets from DBS to Oppenheimer.  Id. at ¶¶ 46-47.  Because the transfer of assets from DBS to Oppenheimer is alleged to have occurred subsequent to Hahn's termination by DBS, that act could not have been committed within the scope of his employment by DBS, and therefore cannot form the basis of DBS's vicarious liability.

Neither can the fraud allegedly committed by Hahn serve as the "improper means" supporting this claim against DBS.  Insurative has alleged in the Amended Complaint that it would not have issued the loans to the insurance trusts without the fraudulent Letter of Credit and the Control Agreement — that is, it alleges that absent Hahn's having employed the "improper means" of creating the fraudulent documents, Insurative's advantageous business relations with the Myers would not have existed at all.  See Docket # 27 at ¶¶ 2, 39, 41 ("Without those fraudulent documents, Insurative would not have agreed to finance the policies").  In this circumstance, Insurative is unable to prove with reasonable certainty damages (i.e., the loss of its business relationship with the Myers) caused by Hahn's wrongful interference because the advantageous relationship was itself created by means of the very interference alleged, and would not have existed otherwise.

20

The gravamen of this tort is that the defendant's improper conduct has impaired a relationship which, absent the improper interference, would have otherwise have continued (or come into being).   That is not a reasonable inference from the Amended Complaint, which presents the opposite scenario.   Absent Hahn's fraud, there would have been no relationship between Insurative and the Myers at all.

Accordingly, I RECOMMEND that the Court DISMISS Count V.

<u>Contract Claims – Counts VII, VIII and IX</u>

Insurative brings two claims sounding in contract and one related equitable claim:  Count VIII is for Breach of Contract; Count IX is for Breach of the Implied Covenant of Good Faith and Fair Dealing; and, Count VII is for Promissory Estoppel.

These claims fail for reasons already described, <u>supra</u>.   Namely, Insurative has no expectation of proving compensable damages on its breach claim.   To state a claim for breach of contract under New York law (<u>see</u> n. 3, <u>supra</u>), Insurative must allege the existence of a contract, its performance under the contract, DBS's breach of that contract and resulting damages. <u>Palmetto Partners, L.P. v. AJW Qualified Partners, LLC</u>, 83 A.D.3d 804, 806 (2011).

Insurative, however, has successfully mitigated its recoverable damages.  <u>See</u>, <u>supra</u> at 15-16.  The remaining damages it seeks in this action (its lost profits from its anticipated relationship with the Myers) are not only highly speculative (<u>see</u> n. 4 <u>supra</u>), but they are barred by the terms of the subject contracts. <u>See</u> Docket # 27-11 at 3 ("in no case shall Company be liable, directly or indirectly, for any . . .  (ii) indirect, special or consequential damages"); Docket # 27-9 (referencing UCC provision barring consequential damages and limiting recovery to monetary amount set forth in the letter of credit, and stating "this Letter of Credit sets forth in full the terms of our obligations to you").

Under New York law, every contract contains an implied covenant of good faith and fair dealing.  Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 68 (1978). "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."  Aventine Inv. Mgt. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (1999) (emphasis added).  Insurative's claim for violation of the implied covenant of good faith and fair dealing must fail, again, because the damages sought are not available under the terms of the subject contract, which in this case exclude the damages sought; See Docket # 27 at ¶ 119 (on Count IX, "Plaintiff Insurative suffered damages in excess of $38 million"); Phoenix Capital Investments LLC v. Ellington Management Group, L.L.C., 51 A.D.3d 549, 550 (2008) ("We adhere to the well-established principle that the implied covenant of good faith and fair dealing will be enforced only to the extent it is consistent with the provisions of the contract").

Finally, recovery on the equitable theory of promissory estoppel is not dependent on the existence of a contract or the particulars of consideration in the classic sense, but rather arises out of a breached promise in circumstances under which it is fair to hold the promisor to the terms of its promise.  Restatement (Second) of Contracts § 90(1) (1981).  Here, the promise made by DBS was to provide collateral for the loans taken by the trustees from Insurative.  To the extent that equity holds DBS to those promises, Insurative mitigated these damages when the Myers paid off the loans.  DBS specifically disclaimed the damages Insurative now seeks in the Letter of Credit and the Control Agreement, and Insurative could not have reasonably relied upon a belief that in the event there was a failure of collateral, DBS would cover twenty years of lost profits.

22

Count VI - M.G.L. c. 93A

In Count VI, Insurative alleges that the acts described elsewhere in the Amended Complaint also constitute unfair and deceptive trade practices, and support a claim under the Massachusetts Consumer Protection Act, M.G.L. c. 93A.  Docket # 27 at ¶¶ 96-106.

DBS argues that the c. 93A claim should be dismissed because Insurative has not pleaded any additional facts not present in the insufficiently-pleaded claims described supra, and it is therefore wholly derivative.  Docket # 32 at 24 (citing Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 62 Mass.App.Ct. 34, 40-41 (2004) (c. 93A claim which was wholly derivative of deficient intentional interference claim is insufficient to establish unfair or deceptive acts)).

Chapter 93A is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Kattar v. Demoulas, 433 Mass. 1, 12 (2000).  A cause of action under c. 93A is "not dependent on traditional tort or contract law concepts for its definition."  Id. at 13. The legality of the underlying conduct is not necessarily a defense to a claim under c. 93A.  Id.   Chapter 93A does not define what constitutes an "unfair or deceptive act or practice" and unfair or deceptive conduct is best discerned from the circumstances of each case.  Id. at 14.

The c. 93A claim in this case is not wholly derivative in two senses.  First, the scope of damages potentially available is different.  The fraudulent misrepresentation claim against DBS fails because, as described supra, Insurative has successfully mitigated the damages available to it on that claim (i.e., reliance damages and the benefit of its bargain with DBS).  The c. 93A claim, however, potentially permits recovery for any reasonably foreseeable losses caused by the

unfair or deceptive acts proven, and so the problem that defeated the fraudulent

misrepresentation claim is not present.  Moreover, although all underlying claims against DBS

are recommended for dismissal, as noted <u>supra</u>, DBS has conceded for purposes of this motion

that Hahn had apparent authority to enter into the Control Agreement and the Letter of Credit.

<u>See</u> n. 2 <u>supra</u>.  Defendant Hahn has not brought a motion pursuant to Fed. R. Civ. P. 12(b)(6),

and Insurative's claims against him will proceed.  Chapter 93A permits liability on a respondeat

superior basis. <u>See</u>, <u>e.g.</u>, <u>Grand Pacific Finance Corp. v. Brauer</u>, 57 Mass.App.Ct. 407, 419

(2003)  To the extent that Insurative could yet prevail against Hahn personally for intentional

interference in Count IV, the 93A claim is not necessarily wholly derivative of dismissed claims.

Accordingly, I RECOMMEND that the Court DENY the motion with respect to Count

VI.

### Count X - Negligent Supervision

Count X alleges that DBS negligently supervised and retained Hahn, when it was aware

of other allegations that he had engaged in misrepresentations.  Docket # 27 at ¶¶ 120-124.

"Negligent retention occurs when, during the course of employment, the employer becomes

aware or should have become aware of problems with an employee that indicated his unfitness,

and the employer fails to take further action such as investigating, discharge or reassignment."

<u>Foster v. Loft, Inc.</u>, 26 Mass.App.Ct. 289, 291–92 (1988) (quoting <u>Garcia v. Duffy</u>, 492 So.2d

435, 438–39 (Fla.Dist.Ct.App.1986)).  To establish the tort of negligent supervision/negligent

retention, Insurative must allege that DBS breached a duty of care owed to Insurative and that

Insurative was harmed as a foreseeable result of that breach of duty. <u>Copithorne v. Framingham</u>

<u>Union Hospital</u>, 401 Mass. 860, 862 (1988).  Specifically, Insurative must prove that: (1) DBS

owed Insurative a duty of care; (2) DBS knew or should have known of Hahn's proclivity to commit misconduct; and (2) DBS failed to take corrective action.  Id.

DBS again objects that this claim is derivative of claims already dismissed.  As discussed supra, claims brought by Insurative against Hahn remain pending.  Should Insurative succeed against Hahn directly on Count IV, for example, DBS could be liable for negligent supervision/retention.  DBS does not assert any other basis for dismissal of these claims.  The damages issue discussed supra with respect to other counts is inapplicable to this claim.[5]

I therefore RECOMMEND that the Court DENY the motion with respect to Count X.

---

[5]  In addition, I note the following issue not raised in the Parties' papers.  Even accepting the factual assertions of the Amended Complaint as true, the Amended Complaint might not create a plausible inference that DBS owed a duty of care to Insurative with respect to its hiring or retention of Hahn.  Whether or not a duty exists presents a question of law.  Davis v. Westwood Group, 420 Mass. 739, 743 (1995).  While DBS might plausibly owe a duty to the Myers (its own customers), the Amended Complaint suggests no basis for extending this duty to Insurative.  Negligent retention cases typically involve duties owed in much less-attenuated circumstances than those presented by the Amended Complaint. See, e.g., Bedard v. Brewer Financial Services, LLC, 2012 WL 5240259 (Mass.Super.) (plaintiffs were customers of securities broker-dealer); Guertin v. McAvoy, 2005 WL 3489766 (Mass. Super.) (duty of school to protect students from sexual assault by its staff); Morrisey v. Lieberman, 2005 WL 2009433 (Mass.Super.) (hospital department chief's duty to hospital's patients); Harju v. Knutson, 1999 WL 1203921 (Mass.Super.) (same) ; Copithorne, 401 Mass. at 862 (same); Petrell v. Shaw, 453 Mass. 377, 409 (2009) (because no negligence, unnecessary to reach issue of whether diocese and bishops owed to parishioners a duty of supervision/retention over parish rector).  Earlier cases characterized the tort as ordinarily relating to situations where "employees are brought into contact with members of the public in the course of an employer's business." Patriarca v. Center for Living and Working, Inc., 1999 WL 791888 (Mass.Super.) (leaving unresolved whether plaintiff could sue own employer for negligent retention of another employee) (quoting Vicarelli v. Business International, Inc., 973 F.Supp. 241, 246 (D.Mass.1997)); Foster, 26 Mass.App.Ct. at 290-91 (defendant's employee injured customer) (quoting Liability of Employer, Other Than Carrier, For a Personal Assault Upon Customer, Patron, or Other Invitee, 34 A.L.R.2d 372, 390 (1954)).  Because the parties did not address this issue, it is not amenable to resolution on the pending motion.

IV.   CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court DENY the Defendant DBS's

Motion to Dismiss (Docket # 31) with respect to Count VI (violation of M.G.L. c. 93A) and

Count X (Negligent Hiring and Retention) and that it otherwise ALLOW the motion.[6]


_____/s / Leo T. Sorokin_____
Leo T. Sorokin
Chief United States Magistrate Judge

---

[6]  The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).